## NORTH COAST LIGHTERAGE CO. v. GREENWOOD.

(Circuit Court of Appeals, Ninth Circuit. May 4, 1908.)

### No. 1,482.

SHIPPING—CARRIAGE OF PASSENGERS—LIABILITY FOR INJURY—DEFECTIVE VESSEL.

Defendant corporation advertised to carry passengers from Nome, Alaska, to points down the coast in the early spring, and undertook to transport them in a gasoline launch. The boat was not heated, was insufficiently supplied with provisions, and the feed pipes were in such leaky condition that the engine froze up and the boat drifted out to sea and was caught in the ice, resulting in serious suffering and injury to the passengers during four or five days before they were landed. Held, that defendant was liable to them for such injuries as a common carrier.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 544.

Carriers by water, see note to Wade v. Lutcher & Moore Cypress Lumber Co., 20 C. C. A. 535.]

In Error to the District Court of the United States for the Second Division of the District of Alaska.

John P. Hartman, A. J. Bruner, Elwood Bruner, and J. Allison Bruner, for plaintiff in error.

Campbell, Metson, Drew, Oatman & MacKenzie, for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. This was an action for damages for personal injuries alleged to have been received by the defendant in error, who was the plaintiff in the court below, while a passenger on board a gasoline launch alleged to have been at the time owned and operated by the plaintiff in error between Nome and Bluff, in the district of Alaska. The trial resulted in a verdict and judgment for the plaintiff. For the plaintiff in error, who was the defendant below, exception was taken to the refusal of the trial court to direct a verdict for the defendant, and to its refusal to give certain requested instructions to the jury.

In support of the first exception mentioned, it is contended that the plaintiff failed to show that the defendant was operating the boat at the time in question, failed to show what it was a common carrier, and failed to show that its alleged negligence was the proximate cause of the plaintiff's injury. An examination of the record clearly shows

that counsel for the plaintiff in error is wrong in each particular. In the first place, the testimony of George T. Williams, who was president and manager of the defendant company, plainly shows that the company was a common carrier engaged in the transportation business in the waters of Alaska, and was the owner of the launch in question, which was called the North Coast. It appears from the record that the launch had been dismantled for the winter season, and shortly before the spring season opened, and while the trails were soft and there was little or no travel up or down the coast, an arrangement was made by and between Williams, E. T. McIntyre, and one Capt. Storey, by which McIntyre, who was an engineer, was to fix the engine in the boat, Storey, who appears to have been familiar with the handling of small boats, was to repair the hull, and the vessel then put in operation between Nome, Solomon, and Bluff upon these terms: McIntyre and Storey each to have one-third of the net profits of the respective trips as compensation for their services, and the remaining third to go to the plaintiff in error. In this connection McIntyre testified:

"Williams thought we were getting too much, and wanted to cut us down, so that the North Coast Company would get half, as they were the owners of the boat. I told him I wouldn't do it. We were doing all the work, and taking chances on our lives and everything, and the least compensation we should have should be a third apiece."

McIntyre further testified:

"I was to get one-third of the net profits of the trip, or as many trips as we were to make. There was no stipulated time. We were to take her as quick as I got her repaired, and go on to Solomon and Bluff. Time of using her was until the opening of navigation. George Williams, one of the agents of the North Coast, inspected her. He came out and told me he wanted to make a trial trip with her. We ran around the bay probably three hours. He ran her himself. He is an engineer. In the conversation with reference to the tug North Coast upon this trial trip, I told Williams I saw the feed pipes were leaking. I told him they were pretty bad. The soft solder— The feed pipes were leaking that feed the oil to the engine. I told him that the feed pipes were leaking, and I fixed them up with soft solder. I told him they they were pretty bad, and he said, 'Yes, they are pretty bad,' and he said when we came back from the trip that we would put hard solder on them and that would likely stand. The joints were leaking, and I put soap and stuff on them out there, and stopped them there a while. The condition of the boat otherwise appeared to be pretty good, but she was leaking pretty badly, making water pretty fast. Williams said it was to be expected. She had just been launched a short time before that. Shortly after that we started on the trip."

The evidence shows that Williams advertised for passengers and freight, and had a banner printed and carried through the streets bearing the words:

"The fast launch North Coast sails to-day for Solomon and Bluff. Tickets at the North Coast Lighterage Company."

Two passengers bought tickets from that company—one the plaintiff in the present case, and the other, Sullivan, plaintiff in the companion case next to be disposed of. The supply of provisions, according to the testimony, put upon the boat for the two passengers and McIntyre and Storey, consisted of "a box of hard tack and two two-pound cans of meat and five gallons of water." It is true that it

appears that there were put on board some other provisions, but they were freight consigned to other parties. Just before the boat started it appears that a north wind sprung up. The condition of the boat in which these passengers were sent to sea may be seen from the testimony already quoted and from this further testimony of the witness McIntyre:

"After we got started, she stopped awhile. The feed pipes froze up; the water pipes, at least. The feed pipes leaked badly that we had the soft solder on, and we stopped. The water pipes then froze. We thawed them out, and got started again, and stopped again. I don't know exactly how many times we did start. The ultimate result was that they froze up so badly that we couldn't do anything with them, and the water pump broke, and we couldn't do anything more. It might have been due to the feed pipes. That is what stopped her in the first place. She didn't get proper feed to the cylinder. Then it was impossible to do anything more with her after the water service was gone. The water circulates in a jacket, and keeps the pistons and cylinder cool, and when you don't get the water service your cylinders and pistons expand, and you don't get an explosion, and she wouldn't go. * * * The combinations of the boat were a sliding cover and a piece of tarpaulin hanging down in front. I am not sure whether the sliding cover was stationary or sliding; just a cover over the top of the engine. I think it was made of canvas, with a flap in front of it. We didn't have any arrangement for heating the boat. There was two gasoline torches there to heat the bulbs with; to heat the engine with coal oil or gasoline. There was some freight—some cream, and some cases of potatoes. They froze up. That was all we found in the line of food (in addition to the hard tack and two two-pound cans of meat already referred to). The potatoes and cream and fruit, that was—fruit—consigned to some one down the coast. When the boat became unmanageable, we went to sea and was caught in the ice."

The result was that it was four or five days before the passengers were landed, resulting in serious suffering and injury to them both. That the plaintiff in error was properly held liable in the court below for that injury we do not think admits of question. The instructions of the court presented the case to the jury fairly, and covered every legal phase of it, which was all it was required to do.

The judgment is affirmed.